## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No. 13 B 25078 |
| | ) | |
| DAVID L. DINI, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| ———————————————— | ) | |
| | ) | |
| JOHN H. SAMMARCO | ) | Adversary Case No. 13 A 01332 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID L. DINI, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

### MEMORANDUM OPINION

Plaintiff John H. Sammarco, one-time business partner of debtor-defendant David L. Dini, filed a nine-count adversary complaint against Dini, seeking a determination that he is not entitled to a discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), and (a)(7).[1] This matter is now before the Court on the claims that remain at issue in the complaint, those in Counts I, V, and VII. For the reasons set forth below, the Court finds that Sammarco has failed to meet his burden to establish the elements required under the applicable provisions of § 727(a). As such, Dini's discharge will not be denied.

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal

Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## BACKGROUND

The pertinent facts are drawn from the complaint, the Court's docket, and the testimony

and various exhibits received into evidence at a two-day bench trial that was held on September

13 and 27, 2016. Both Dini and Sammarco testified at that trial, as well as four other witnesses:

(1) Elizabeth McDonough, former controller at National Telerep Marketing Systems, Ltd.

("NTMS"); (2) Gregory John Woodin, vice president of credit administration at Signature Bank

(the "Bank"); (3) Kevin Bastuga, executive vice president at the Bank; and (4) J. Ryan Potts,

attorney for the Bank. As established by the applicable documents and the trial testimony, the

facts that are relevant to Sammarco's objection to Dini's discharge can be summarized as

follows.

In the early 1990s, Dini founded NTMS, a telemarketing company that sold unused air

time to businesses throughout the United States seeking to advertise on the radio. (Trial Tr. vol.

1, 34:3-20, 167:11-13, Sept. 13, 2016; Trial Tr. vol. 2, 56:12-16, 154:9-11, Sept. 27, 2016.) At

its height, NTMS employed approximately thirty salespeople and other staff. (Trial Tr. vol. 2,

177:10-15.) The company operated out of a building in Mount Prospect, Illinois (the "Mount

Prospect Property"), which was owned by a trust held by Dini's wife Laura (the "Dini Trust").

(Pl.'s Ex. 19 at 28[2]; Trial Tr. vol. 1, 179:25-180:1; Trial Tr. vol. 2, 192:14-24.) Although Dini

---

[2] All references to exhibits are to those submitted by the parties during the trial.

was responsible for the financial health of NTMS and had a bachelor's degree in accounting, his

primary duties as sole owner and president of the company were not bookkeeping or accounting;

rather, he focused on sales, training, and management. (Trial Tr. vol. 1, 39:22-25, 41:6-9; Trial

Tr. vol. 2, 53:7-14, 150:19-22, 155:5-156:20.)

Several years after NTMS's genesis, Sammarco, a friend of Dini's father, met with Dini

to talk about his interest in the company.  (Trial Tr. vol. 2, 211:18-19, 229:24-231:7.)

Subsequently, in 1997, Sammarco became a shareholder of NTMS through the purchase of stock

for which he paid $720,000.  (Trial Tr. vol. 2, 56:17-22, 195:18-196:1, 231:8-12, 232:1.)  As a

partner at NTMS over the next eleven years, Sammarco worked in various areas of the company,

including sales, operations, collections, customer service, accounting, recruitment, and training.

(Trial Tr. vol. 2, 231:20-232:14.)

## The Stock Buyout and the Decline of NTMS

In May 2008, Dini and Sammarco came to an agreement whereby Dini would buy out

Sammarco's interest in NTMS.  (Trial Tr. vol. 1, 111:6-10, 178:12-24; Trial Tr. vol. 2, 56:23-24,

232:2-3, 233:3-17.)  Accordingly, on May 6, 2008, Dini agreed to purchase Sammarco's NTMS

stock for $1,300,000.  (Trial Tr. vol. 2, 233:3-17, 234:10-12.)   Sammarco was paid $400,000 as

a down payment.  (Trial Tr. vol. 2, 161:4-5, 233:18-20.)  The remaining $900,000 of the

purchase price plus interest was to be paid via a promissory note in monthly installments of

$17,087.39 over five years.  (Trial Tr. vol. 2, 68:24-69:1, 160:20-161:3, 196:20-25, 233:21-22,

234:24-235:9.)

NTMS made the $400,000 down payment on Dini's behalf by borrowing on a working

capital line of credit in the principal amount of $600,000 that it had obtained from the Bank in

3

February 2008 (the "NTMS Loan"). (*See* Pl.'s Exs. 1-4; Trial Tr. vol. 1, 167:18-169:2; Trial Tr.

vol. 2, 157:10-15, 161:14-19, 163:14-19.) The primary purpose of that loan, in fact, was to buy

out Sammarco's interest in NTMS. (Trial Tr. vol. 1, 175:24-177:3; Trial Tr. vol. 2, 56:23-57:4,

157:10-15, 161:14-19.) In addition to the loan agreement itself, a promissory note and

commercial security agreement were also executed, the latter providing the Bank with a security

interest in all of NTMS's assets. (Pl.'s Exs. 1 & 2; Trial Tr. vol. 1, 170:5-12.) The three

documents were signed by Dini in his capacity as president of NTMS. (*See* Pl.'s Exs. 1, 2, 4.)

Dini also signed a commercial guaranty in connection with the loan which ensured his personal

liability for the company's obligation. (Pl.'s Ex. 3; Trial Tr. vol. 1, 170:17-171:17.)

In August 2008, subsequent to Dini's purchase of Sammarco's NTMS stock, Dini, his

wife Laura ("Laura"), and the Dini Trust (together, the "Group Borrowers") obtained a loan from

the Bank in the principal amount of $700,000 (the "Dini Loan"). (*See* Pl.'s Exs. 5 & 6; Trial Tr.

vol. 1, 180:11-21; Trial Tr. vol. 2, 59:17-20; 157:16-19.) Pursuant to the loan agreement, the

loan proceeds were to be disbursed as follows: $400,000 to pay down the NTMS Loan,

$300,000 to pay off the second mortgage on Dini's home in Kildeer, Illinois (the "Kildeer

Property"), and any remaining amounts to be used by the Group Borrowers for working capital

purposes. (Pl.'s Ex. 6; Trial Tr. vol. 1, 182:12-183:20; Trial Tr. vol. 2, 61:13-62:10, 161:20-24.)

The note in connection with the Dini Loan was secured by a second position on three pieces of

real estate: the Kildeer Property, the Mount Prospect Property, and a condominium owned by

Dini on Larrabee Street in Chicago (the "Larrabee Property"). (Pl.'s Ex. 5; Trial Tr. vol. 1,

179:22-180:5.) The loan term was one year; thus, the Group Borrowers had to either repay the

loan within that time or renew it. (Pl.'s Ex. 5; Trial Tr. vol. 1, 180:22-181:2, Trial Tr. vol. 2,

4

158:14-159:6.)  Thereafter, the Group Borrowers, NTMS, and the Bank entered into a series of

agreements that modified and extended both the NTMS Loan and the Dini Loan. (*See* Pl.'s Exs.

8 & 10-15.)  Those agreements provided for, among other things, the cross-collateralization of

the two loans.[3]  (*See id.*)

After making the down payment to Sammarco for the NTMS stock, Dini began making

monthly payments on the $900,000 due under the note.  (Am. Pretrial Statement at 6; *see* Def.'s

Ex. 2; Trial Tr. vol. 1, 111:16-22.)  Those payments, while made by Dini, came from NTMS

through a mechanism called "Loan to Shareholder," through which Dini was paid compensation

by the company when money was available, rather than on any kind of regular basis.  (Trial Tr.

vol. 1, 65:23-69:6, 222:3-20; Trial Tr. vol. 2, 161:25-162:18; 163:21-164:4, 205:23-206:15; *see*

Pl.'s Exs. 57 & 86.)  Dini continued to make full monthly payments to Sammarco through the

"shareholder loans" until December 2011.  (*See* Def.'s Ex. 2; Trial Tr. vol. 1, 61:9-11, 215:21-

24.)

By that time, NTMS was losing money and its financial condition deteriorating.  (Trial

Tr. vol. 1, 55:5-56:23, 64:18-65:9, 215:-3-216:17; Trial Tr. vol. 2, 77:15-78:24, 165:25-166:6.)

According to the company's income tax returns for tax years 2009 through 2012, gross receipts

---

[3] According to the first of the agreements, executed in May 2009, "[a] default by [the] Group Borrower[s]
pursuant to the terms of the [Dini Loan] Instruments shall be deemed a default by [NTMS] pursuant to the terms of
the [NTMS Loan] Instruments" and "[a] default by [NTMS] pursuant to the terms of the [NTMS Loan] Instruments
shall be deemed a default by [the] Group Borrower[s] pursuant to the terms of the [Dini Loan] Instruments." (Pl.'s
Ex. 8 ¶¶ 1(E) & 2(F)).  The first agreement also provided that NTMS and the Group Borrowers would be "jointly
and severally liable for the obligations" of the other.  (*Id.* ¶¶ 1(F) & 2(G).)  The agreement did not contain "cross-
collateralization" language.
        In September 2010, the Group Borrowers, NTMS, and the Bank entered into a second agreement.  (Pl.'s
Ex. 10.)  This one referenced the first, noting that, thereunder, the parties had agreed to, *inter alia*, extend the loan
term and "cross collateralize the Loans."  (*Id.* at 2.)  The modifications that followed each referred to the prior
agreements and reaffirmed and incorporated the terms and provisions of both the original loan instruments and the
prior agreements.  (*See* Pl.'s Exs. 11-15.)

had dropped 52% during the four-year period, from $4,586,960 in 2009 to $2,179,745 in 2012.

(Pl.'s Ex. 69; Trial Tr. vol. 2, 77:25-78:24.) McDonough testified that, although the company

had always struggled financially, by 2012 she could not "keep up" with NTMS's bills and,

eventually, had concerns about how she would make payroll. (Trial Tr. vol. 1, 55:5-56:23, 60:6-

61:5.) She further testified that there were "significant overdrafts" in NTMS's operating account

at the Bank in May of 2012; that, in fact, the account was overdrawn "almost every day"; and that

she recalled seeing a $60,000 overdraft at some point in 2012. (Trial Tr. vol. 1, 85:25-86:5,

98:22-24; 116:11-24.) According to McDonough, overdrafts were not necessarily reflected in

NTMS's general ledger unless the Bank charged an overdraft fee. That was because bank

statements are "fluid," and Quickbooks, the program used to create and maintain NTMS's

general ledger, showed only the balance of the checks written and deposited, not necessarily the

payments that had cleared "at any given point." (Trial Tr. vol. 1, 35:16-22, 117:3-16.)

Dini similarly testified that, while the balance in the NTMS bank account fluctuated, the

account was overdrawn on a daily basis. (Trial Tr. vol. 2, 182:8-10.) According to Dini, in the

spring of 2012, NTMS's account was overdrawn by as much as $70,000. (Trial Tr. vol. 2, 182:6-

15.) Although he admitted that he had no written documentation supporting an overdraft as high

as $70,000, Dini testified that he remembered seeing a figure of "sixty or seventy grand" either

on a computer screen or in a document. (Trial Tr. vol. 2, 137:13-22, 140:6-141:18, 213:23-

214:17.)

Given the declining financial condition of NTMS, Dini testified, he was able to make

only partial monthly payments, of $8,000 each, to Sammarco from January to April 2012. (*See*

Def.'s Ex. 2; Trial Tr. vol. 2, 165:21-23, 204:19-23, 235:15-17, 236:2-6.) Subsequently, Dini

6

and Sammarco tried to renegotiate the payment terms under the note. (Trial Tr. vol. 2, 167:24-168:4, 236:13-15.) Those attempts proved to be futile, and, in May 2012, all payments to Sammarco stopped. (Trial Tr. vol. 1, 216:5-7; Trial Tr. vol. 2, 167:2-168:7, 204:12-205:1, 236:13-20.) By that time, Dini had paid Sammarco a total of $595,883.87 under the note through his "shareholder loans" from NTMS.[4] (*See* Def.'s Ex. 2; Trial Tr. vol. 1, 101:9-17, 112:5-17; Trial Tr. vol. 2, 163:21-164:4.)

Unhappy that the payments had ceased, Sammarco filed a breach of contract suit against Dini and NTMS on July 11, 2012 in the Circuit Court of Cook County, seeking damages of $330,429, a figure that was later increased to $461,730 to account for attorneys' fees, interest, and costs. (Am. Pretrial Statement at 7; Pl.'s Ex. 32 at ¶ 9; Trial Tr. vol. 2, 168:16-22, 238:13-24.) Subsequent efforts to settle were unsuccessful. (Trial Tr. vol. 2, 169:9-21.)

### The Funds Borrowed from Keith Creel

At some point in 2012, Dini approached his friend Keith Creel to borrow some money. (Trial Tr. vol. 1, 77:21-78:5, 80:14-16, 114:5-8; Trial Tr. vol. 2, 134:4-9.) In response, Creel provided Dini with a check dated May 4, 2012 in the amount of $100,000. (Pl.'s Ex. 55; *see also* Trial Tr. vol. 2, 183:8-15.) Dini endorsed the check to NTMS's lawyers, and $40,000 of the funds were subsequently transferred into the company's operating account at the Bank. (Trial Tr. vol. 1, 81:1-83:23; Trial Tr. vol. 2, 135:7-10, 184:5-19.) Both Dini and McDonough testified that the money from Creel was used to cure NTMS's overdrawn account, as well as to pay both

---

[4] At trial, Dini testified that he paid Sammarco more than $595,000 in monthly payments. (Trial Tr. vol. 2, 164:2-19, 197:10-19.) In fact, according to Dini, he paid Sammarco approximately $700,000 under the note. (Trial Tr. vol. 2, 197:15-19.) Despite his testimony, however, Dini was not able to point to any documentation to corroborate that claim. (Trial Tr. vol. 2, 197:18-198:4.)

personal and business expenses.[5]  (Trial Tr. vol. 1, 114:14-23; Trial Tr. vol. 2, 135:23-25, 141:19-142:24, 182:19-25, 184:16-186:24.)

On October 12, 2012, an additional $190,000 was wired from Creel to NTMS.  (Def.'s Ex. 5; Trial Tr. vol. 2, 136:14-18.)  McDonough testified that Dini borrowed the money to help pay NTMS's debts.  (Trial Tr. vol. 1, 87:23-88:11.)  Some of the funds also went to pay Dini's state and federal taxes, as well as other personal and business expenses incurred through American Express.[6]  (*See* Pl.'s Ex. 60; Def.'s Ex. 5; Trial Tr. vol. 1, 90:2-25, 92:1-18; Trial Tr. vol. 2, 186:13-24.)

### The Vehicle Trade-Ins

In January 2013, Dini traded in his 2008 Cadillac Escalade (the "Cadillac"), the "family" car that Laura drove, and bought a new 2013 Jeep Grand Cherokee (the "Jeep").  (Pl.'s Ex. 22 at 4; Trial Tr. vol. 2, 143:20-22; 144:3-13, 178:21-179:3.)  Dini testified that the Cadillac had been paid off at the time of trade-in.  (Trial Tr. vol. 2, 144:1-2, 179:7-10, 212:20-22.)  He further testified that the vehicle had more than 170,000 miles on it and was in need of repairs.  (Trial Tr. vol. 2, 179:4-6, 212:10-13.)  Of the $18,500 he received for the trade-in, Dini used $4,000 as a down payment on the Jeep and took a check for the balance.  (Pl.'s Ex. 22 at 4; Trial Tr. vol. 2, 145:16-22.)

---

[5] According to Dini, he transferred only $40,000 of the money he received from Creel, rather than $70,000 to cure the purported overdraft, because there were "other things" that he needed to use the balance of the money to pay.  (Trial Tr. vol. 2, 185:2-4.)

[6] McDonough testified that when she saw personal expenses on the NTMS American Express credit card, she would identify them as such and then expense them to the "Loan to Shareholder" account.  (Trial Tr. vol. 1, 97:1-8, 119:22-120:11.)

Subsequently, in May 2013, Dini traded in his 1998 Lincoln Navigator (the "Lincoln") for

$2,000 and entered into a three-year lease for a Chrysler 300 (the "Chrysler"). (Pl.'s Exs. 21 at

15 & 22 at 4; Trial Tr. vol. 2, 146:3-14, 179:19-180:2.)  The monthly lease payment was

$609.45.  (Trial Tr. vol. 2, 146:15-17.)  Like the Cadillac, the Lincoln had no debt on it, had been

driven over 170,000 miles, and was not running well.  (Trial Tr. vol. 2, 146:6-7, 180:5-9, 211:22-

24, 212:10-19.)  Dini testified that he was going to start conducting business with auto

dealerships and that he needed a vehicle like the Chrysler that would be appropriate for that

purpose.  (Trial Tr. vol. 2, 180:11-24.)

### The Chapter 11 Bankruptcy Filings

With NTMS in financial decline and a decision on Sammarco's motion for summary

judgment in the state court imminent, Dini and NTMS filed voluntary petitions for relief under

chapter 11 of the Bankruptcy Code on June 18, 2013 (the "Petition Date").  (Bankr. Nos. 13-

25077 & 13-25078; *see* Pl.'s Exs. 18 & 20; Trial Tr. vol. 2, 169:25-170:25, 238:25-239:4.)  Dini

signed a declaration stating under penalty of perjury that he had reviewed the schedules,

statements of financial affairs, and accompanying documents that were subsequently filed in

connection with both bankruptcies.  (Pl.'s Exs. 19 & 23.)  On both petitions, Sammarco was

listed among the creditors holding the twenty largest unsecured claims.  (Pl.'s Exs. 18 & 20.)

Sammarco's claims, reported as contingent, unliquidated, and disputed, were listed in the amount

of $460,000 on the NTMS petition and $330,429 on the Dini petition.[7]  (*Id.*)

---

[7] As noted above, Sammarco's complaint in the state court seeks damages of $330,429, a figure that was later increased to $461,730 to account for attorneys' fees, interest, and costs.  (Am. Pretrial Statement at 7; Pl.'s Ex. 32 at ¶ 9; Trial Tr. vol. 2, 168:16-22.)

NTMS's schedules and statement of financial affairs were subsequently filed on July 9, 2013. (Pl.'s Ex. 19.)  Schedule B reflected NTMS's accounts receivable, with book values of $428,067.17 for 2010, $217,721.70 for 2011, and $171,675.64 for 2012 and current values, at the time, for 2013 receivables of $139,690.34 for those due as of the Petition Date and $154,616 for those not yet due. (*Id.* at 8.)  Listed as "[o]ther liquidated debts owed to debtor" was "Loan to Shareholder - David Dini" with a value of $688,471.64. (*Id.* at 9.)  Schedule D reflected just one creditor holding a secured claim.  According to that schedule, the Bank held a "Security Interest," with a "Blanket Lien on all Assets," in the amount of $594,000. (*Id.* at 11.)  On schedule H, only Dini was listed as a codebtor also liable on the Sammarco and Bank debts listed in NTMS's schedules. (*Id.* at 22.)

According to its statement of financial affairs, NTMS's income was $2,750,518.28 for 2011; $2,179,314.74 for 2012; and $1,108,340.27, year-to-date as of the Petition Date, for 2013. (*Id.* at 24.)  "Income other than from . . . [the] operation of business" included cash payments received from Dini to reduce NTMS's "shareholder loans" to him:  $21,000 paid on April 21, 2011; $21,867.34 on February 7, 2012; $1,000 on April 24, 2012; and $190,000 on October 12, 2012. (*Id.* at 24 & 25.)

Dini's schedules and statement of financial affairs were filed on July 15, 2013. (Pl.'s Exs. 21 & 22.)  Amended schedules B, D, F, and H were subsequently filed on February 18, 2014. (Pl.'s Ex. 24.)  Schedule B reflected both the Jeep and, as "[o]ther personal property," a claim for a preferential transfer to an insider for the "repayment of loan" to NTMS in the amount of $190,000. (*Id.* at 3 & 4.)  Schedule G listed a "[t]hree year lease" with Chrysler Financial for the Chrysler. (Pl.'s Ex. 21 at 15.)

10

The Bank was included among the creditors holding secured claims on Dini's schedule D. On the originally filed schedule, only the NTMS Loan was listed, with a notation that Dini personally guaranteed that loan.[8] (Pl.'s Ex. 21 at 8.) On the subsequently filed amended schedule D, there were two entries for the Bank. (Pl.'s Ex. 24.) The one that seems to correspond to the Dini Loan was listed in the amount of $601,460.64, with the collateral identified as "Equity Line of Credit[,] Mortgage on 700 N. Larrabee Street, and two properties owned by Laura Dini Trust (Debtor home and NTMS office building)." (Id.) The other entry, which appears to correspond to the NTMS Loan, was listed in the amount of $596,227.50, with the collateral identified as "Security Interest[,] NTMS, Ltd. Loan personally guaranteed by Debtor." (Id.) Both claims were marked as "disputed," with notations questioning whether the collateral securing each also secures the other. (Id.)

In addition to Sammarco, other creditors listed as holding unsecured nonpriority claims on Dini's amended schedule F were Creel, whose claim totaled $290,000, and NTMS, whose loan-to-shareholder claim was listed in the amount of $688,471.64. (Id.)

Among the entries on Dini's originally filed schedule H, NTMS was listed as a codebtor on the Bank debt in Dini's schedules. (Pl.'s Ex. 21 at 16.) On the later-filed schedule H, Laura and the Dini Trust were added as codebtors as to various creditors, including the Bank. (Pl.'s Ex. 24.)

---

[8] The entry reads: "Equity Line of Credit[,] National Telerep Marketing Systems, Ltd. loan secured by mortgage on Debtor's residence in Kildeer, IL and Condo in Chicago, IL[,] Secured by all business assets - Debtor has personal guarantee." (Pl.'s Ex. 21 at 8.) Dini testified that this description corresponded to the NTMS Loan, although he did not know why the Mount Prospect Property was not listed as part of the security. (Trial Tr. vol. 2, 101:15-102:13, 172:14-173:5.) He later testified that the amount of the claim, $597,438.91, corresponded to the Dini Loan, not the NTMS loan. (Trial Tr. vol. 2, 172:14-173:5.)

Dini's statement of financial affairs reflected that his income from NTMS totaled

$551,805 for 2011; $153,405.15 for 2012; and, year to date as of the Petition Date, $6,500 for

2013. (Pl.'s Ex. 22 at 1.) Other income included $18,500 for the Cadillac trade-in and

$137,423.81 for loans from NTMS, both in 2013. (*Id.* at 1, 2, 4.) Also in 2013, Dini listed total

payments to the Bank, among others, of $11,458.98 made within ninety days immediately

preceding the commencement of his bankruptcy case, leaving $597,438.91 still due and owing.

(*Id.* at 2.) The trade-ins of both the Cadillac and the Lincoln were listed under "[o]ther

transfers." (*Id.* at 4.)

The Bank filed secured proofs of claim in the amount of $1,197,688 each in both the

NTMS and the Dini bankruptcy cases. (Pl.'s Exs. 28 & 29.) Both claims were listed as secured

by liens on the Kildeer Property, the Mount Prospect Property, the Larrabee Property, and

NTMS's accounts receivable. (*Id.*) The claim in the NTMS case was filed on November 11,

2013, the one in Dini's case on December 2, 2013. (*Id.*)

Sammarco also filed proofs of claim in both bankruptcy cases. (Pl.'s Exs. 61 & 62.)

Both unsecured claims were listed in the amount of $513,372.72 each and filed on November 6,

2013. (*Id.*)

### The 363 Sale of NTMS's Assets

Shortly after the Petition Date, NTMS decided that a sale of substantially all of its assets

was "a viable option" as long as a purchaser "would pay cash to unsecured creditors for the assets

and assume some or all of the debt owed to the Bank." (Pl.'s Ex. 32 ¶ 16; *see also* Trial Tr. vol.

2, 175:11-176:1.) On July 12, 2013, Michael Procaccini, a high school friend of Dini's,

submitted a letter of intent memorializing his willingness to purchase substantially all of

12

NTMS's assets. (Pl.'s Ex. 30; *see also* Trial Tr. vol. 2, 176:4-8.) Thereafter, on August 19,

2013, NTMS filed a motion to set bidding procedures in connection with the sale pursuant to §

363 (the "Sale Procedures Motion"). (Pl.'s Ex. 32.) That motion proposed Procaccini as the

stalking-horse bidder (the "Stalking Horse"), disclosed his connection to Dini, and set forth the

proposed terms and procedures of a public auction for the company's assets. (*Id.* ¶¶ 16-25.)

Pursuant to the motion, the Stalking Horse offered to buy substantially all of NTMS's assets in

exchange for the assumption of a $594,000 liability to the Bank and a cash payment of $200,000.

(*Id.* ¶¶ 16-25 & 36.) Of that $200,000, $100,000 would go to pay down the liability to the Bank,

with the remaining $100,000 available for distribution to NTMS's creditors. (*Id.* ¶¶ 22 & 36.)

The motion also indicated that the Stalking Horse intended to hire Dini as an employee to run the

business. (*Id.* ¶¶ 20 & 55.)

On August 20, 2013, Sammarco filed an objection to the Sale Procedures Motion.

(Bankr. No. 13-25077, Docket No. 36.) According to that objection, the proposed procedures

were intended to chill the bidding process, did not provide third parties with an opportunity to

make an offer for NTMS's assets, and ensured that the Stalking Horse would be the winning

bidder. (*Id.* at 1-4; Trial Tr. vol. 2, 242:1-9.) Sammarco also alleged that the sale procedures

were a "poorly veiled means" to transfer NTMS's ownership back to Dini "free and clear."

(Bankr. No. 13-25077, Docket No. 36 at 4-7.)

After reviewing the pleadings and conducting a hearing, the Court entered an order on

September 3, 2013, granting NTMS's Sale Procedures Motion, with modifications based on

Sammarco's objection (the "Sale Procedures Order"). (Bankr. No. 13-25077, Docket No. 50

(granting the motion, "but only upon the terms and conditions set forth" therein).) Pursuant to

the order, the hearing to approve the sale was scheduled for October 2, 2013. (*Id.* ¶ 2.) If there

was at least one party, other than the Stalking Horse, who was a qualified bidder, however, the

hearing would be adjourned for the purpose of conducting an auction on October 1, 2013.[9] (*Id.* ¶

3(A).) NTMS was directed to provide potential bidders with "reasonable access to due diligence

materials and relevant financial information . . . for the purpose of making a bid." (*Id.* ¶ 3(L).)

On September 5, 2013, NTMS filed notice of the sale, and the terms and procedures thereof, as

required by the Sale Procedures Order. (Bankr. No. 13-25077, Docket No. 54.)

Sammarco testified that he subsequently began preparing to become a qualified bidder.

To that aim, he paid a participation deposit, and his attorneys exchanged various email messages

and telephone calls with counsel for NTMS, seeking the production of due diligence documents.

(Bankr. No. 13-25077, Docket No. 68 ¶¶ 14-27; Trial Tr. vol. 1, 252:11-15; Trial Tr. vol. 2,

28:23-29:1, 116:7-10, 244:19-20.) Although some materials were produced, Sammarco alleged

that NTMS failed to provide all documents that "any asset purchaser would need to review in

order to make a bid on the [company's] assets." (Bankr. No. 13-25077, Docket No. 68 ¶ 21; *see

also* Trial Tr. vol. 2, 29:2-7, 245:4-18.)

Accordingly, on September 20, 2013, Sammarco filed a motion to appoint a chapter 11

trustee and to vacate the Sale Procedures Order and the existing sale date. (Bankr. No. 13-25077,

Docket No. 68.) In that motion, Sammarco alleged that NTMS breached its fiduciary duties to

creditors in its handling of the 363 sale process and that its actions demonstrated that it had "no

interest in engaging in a true sale of its assets." (*Id.* ¶¶ 1, 28) At best, Sammarco claimed, NTMS

---

[9] According to the order, to be a qualified bidder, a potential bidder had to timely provide counsel for
NTMS with a participation deposit in the amount of $75,000, as well as the potential bidder's "most recent financial
statements . . . and such other evidence of financial wherewithal" to demonstrate that the bidder was able to
"consummate the transaction." (Bankr. No. 13-25077, Docket No. 50 ¶ 3(C).)

14

was "unprepared for the due diligence process associated with the sale"; at worst, it had "intentionally refused" to provide the kind of materials that a potential buyer would need to make an informed bid. (*Id.*) With the Court's assistance, the due diligence issues were ultimately resolved, rendering Sammarco's motion moot. (*See* Bankr. No. 13-25077, Docket Nos. 96 & 192; Trial Tr. vol. 2, 245:11-16.)

On October 29, 2013, the Court entered a scheduling order. That order directed the Stalking Horse to file a final asset purchase agreement and tender it to counsel for NTMS and Sammarco by October 30, 2013. It also directed Sammarco to file his bid by November 6, 2013. (Bankr. No. 13-25077, Docket No. 101.) The auction was then re-set for November 12, 2013. (*Id.*)

In accordance with the scheduling order, an asset purchase agreement between NTMS and the Stalking Horse was filed on October 30, 2013. (Bankr. No. 13-25077, Docket No. 102.) Sammarco, however, did not file a bid. Rather, on November 8, 2013, he filed a motion to amend the Sale Procedures Order to provide that the full cash purchase price of $700,000 generated by the 363 sale of NTMS's assets be held in escrow pending further order of the Court, on the basis of either equitable subrogation or the marshaling of assets (the "Motion to Amend"). (Bankr. No. 13-25077, Docket No. 113.) Among the allegations that Sammarco raised in the motion was that NTMS's obligations to the Bank had not been fully disclosed. Specifically, Sammarco alleged that he had only recently discovered that NTMS had a secured obligation to the Bank by virtue of not only the NTMS loan, but also the Dini Loan and that the two loans were cross-collateralized. (*Id.* ¶¶ 16-23.)

15

On December 4, 2013, the Court conducted a hearing on the sale of NTMS's assets (the "Sale Hearing"). At that hearing, documents were introduced establishing that the Bank does indeed have two outstanding loans—the NTMS Loan and the Dini Loan—and that, pursuant to a series of modification and extension agreements, the two loans are cross-collateralized. (Sale Approval Trial Tr., 7:18-25, Dec. 10, 2013.)[10] Dini, Procaccini, and Bastuga all confirmed that if the sale to the Stalking Horse were approved, the Stalking Horse would assume NTMS's loan under its current terms and the Bank would release NTMS from obligations on both the NTMS Loan and the Dini Loan. (Sale Approval Trial Tr., 7:1-9.)

Sammarco testified at the Sale Hearing that he was not offered the same terms by the Bank that were offered to the Stalking Horse. That is, he was not offered a loan that would be non-recourse to him. (Sale Approval Trial Tr., 8:3-6.) Bastuga testified that the Bank was willing to make that type of loan only to the Stalking Horse because the Stalking Horse had obtained Dini's commitment to continue to work for and run the purchased business. (Sale Approval Trial Tr., 8:7-11.) The Bank was not willing to make such a loan to Sammarco with whom it had no relationship and who, the Bank alleged it had learned through due diligence, was unlikely to be able to retain NTMS's employees to run the business to which the Bank would be making a loan. (Sale Approval Trial Tr., 8:12-17.) Sammarco testified that because the Bank was not willing to offer him a non-recourse loan, he decided that matching or exceeding the Stalking Horse's bid would be "too much risk" for him to assume. (Sale Hearing Trial Tr., 135:7-138:7, Dec. 4, 2013.)

---

[10] The facts that follow were set forth by the Court at a hearing that took place on December 10, 2013, during which the sale was approved (the "Sale Approval Hearing"). The transcript from the Sale Hearing conducted on December 4, 2013 is available at Docket No. 197 in NTMS's bankruptcy case (Bankr. No. 13-25077). The transcript from the Sale Approval Hearing is available at Docket No. 198.

Concluding that the sale to the Stalking Horse was in the best interest of the estate, the Court approved the sale on December 10, 2013. According to the Court, the alternative to the sale would have likely been the liquidation of NTMS, which would have produced no funds for the estate and a significant deficiency claim for the Bank. (Sale Approval Trial Tr., 8:25-9:3.) The Court noted that the testimony with respect to the value of NTMS's assets and the position of the Bank suggested that "no alternative bidder would be willing to provide more value to the estate than that being provided by the Stalking Horse." (Sale Approval Trial Tr., 9:4-9.) Although this was unfortunate, the Court said, it was "not due to any bad faith or wrongdoing on the part of [NTMS] or [the] [S]talking-[H]orse bidder. Rather, it [was] due to financial realities of [NTMS's] obligations to the [B]ank, its current operations, and the minimal value of [NTMS's] assets in the event of liquidation." (Sale Approval Trial Tr., 9:10-16.) The Court went on to find as follows:

> The [S]talking [H]orse made a credible bid. In fact, that bid was increased from its original terms in response to demands from the [B]ank. The terms of the bid were fully disclosed, including the relationship between the [S]talking-[H]orse bidder and Dini, Dini's further employment with the new owner, and the possibility that Dini would have the opportunity at some point in the future to earn back equity in the new entity.
>
> The initial failure of the parties to disclose the cross-collateralization of [the NTMS Loan] and the Dini [L]oan was not the result of a purposeful misrepresentation or withholding. And when the cross-collateralization was discovered and disclosed, the [B]ank agreed to sale terms that included a complete waiver of any deficiency claim against [NTMS] on either [its] loan or the Dini [L]oan.
>
> [NTMS's] conduct in proposing the [S]talking-[H]orse offer did not involve any wrongdoing and the process did not take advantage of other bidders. The simple fact is that [NTMS's] assets did not support a better bid than that received by the [S]talking [H]orse, and the [B]ank was willing to provide the financing terms testified to only to the [S]talking [H]orse because of his ability to secure . . . Dini's commitment to work for the [S]talking [H]orse.

17

> While the [B]ank's terms did put the [S]talking [H]orse in a favorable position
> for purposes of the sale, that favorable position did not result [from] any bad
> faith, collusion or fraud. It was . . . simply the reality of the financial position
> of the parties.

> Absent the consent of [the] Bank to the sale, the sale would not be possible
> under Section 363 . . .. The financial position of [NTMS] and the conditions
> under which [the] Bank is consenting to the sale make it unlikely that a bidder
> other than the [S]talking [H]orse could be the successful bidder, but that does
> not mean that the sale cannot be approved. The obligations to [the] Bank are
> such that the [B]ank holds the key to any sale, and the [C]ourt cannot force the
> [B]ank to accept one borrower over another.

(Sale Approval Trial Tr., 9:17-11:10.) According to the Court, the only alternatives to the sale

would have been for the Bank to credit bid or foreclose, neither of which would have provided as

much for the estate as the sale. (Sale Approval Trial Tr., 11:11-14.) Accordingly, the Court

concluded that the Stalking Horse was a good-faith purchaser under § 363, the sale was

approved, and Sammarco's Motion to Amend was denied as moot. (Sale Approval Trial Tr.,

11:14-17, 15:20-23; Bankr. No. 13-25077, Docket No. 156.) An order authorizing and

approving the sale was entered on December 19, 2013. (Bankr. No. 13-25077, Docket No. 160.)

Subsequently, NTMS filed a motion to dismiss its bankruptcy case. (Bankr. No. 13-

25077, Docket No. 188.) On March 25, 2014, the Court granted that motion, and the case was

closed on March 31, 2014. (Bankr. No. 13-25077, Docket Nos. 193 & 195.)

### Sammarco's Motion to Dismiss Dini's Bankruptcy Case Under § 707(b)

On February 12, 2014, approximately two months after the Court approved the sale of

NTMS's assets to the Stalking Horse, Dini filed a motion to convert his chapter 11 bankruptcy

case to a case under chapter 7. (Bankr. No. 13-25078, Docket No. 62.) According to the motion,

Dini was not able to generate enough income to pay both his expenses and his unsecured

creditors, and, thus, he did not believe that he could propose a feasible plan. (*Id.* ¶ 9.) On

18

February 19, 2014, the Court granted the motion and entered an order converting Dini's case.

(Bankr. No. 13-25078, Docket No. 70.)

About four months later, on June 4, 2014, Sammarco filed a motion to dismiss Dini's

case pursuant to § 707(b)(3) and requested a one-year bar to filing subsequent bankruptcy cases.[11]

(Pl.'s Ex. 63.) In that motion, Sammarco sought dismissal for "abuse," arguing that Dini had

filed his bankruptcy case in bad faith. (*Id.* ¶ 1.) Because dismissal under § 707(b) is authorized

only in cases involving an individual debtor with "primarily consumer debts," 11 U.S.C. §

707(b)(1), the Court agreed, at Dini's request, to first consider the threshold issue of whether

Dini's debts are primarily consumer debts. (*See* Pl.'s Ex. 64 at 1.)

Not surprisingly, Sammarco argued that Dini's debts are primarily consumer debts. (Pl.'s

Ex. 63.) After performing what he called a "detailed analysis" of the debts listed in Dini's

bankruptcy schedules and claims, Sammarco alleged that $3,877,310.39 of Dini's total debts of

$4,579,012.05, or nearly 85%, are consumer debts, including the $290,000 that Dini borrowed

from Creel. (*Id.* ¶ 11.)

In response, Dini filed an objection to Sammarco's motion to dismiss, arguing that his

debts are primarily non-consumer debts. (Pl.'s Ex. 59.) According to Dini, Sammarco

incorrectly classified eight of the debts, totaling nearly $2,400,000, as consumer debts. (*Id.* §

2.1.) Of those, Dini argued, $70,000 of the $290,000 debt owed to Creel was to be used to fix

the overdraft problem at NTMS and was, therefore, not consumer debt. (*Id.*) In support of that

---

[11] Section 707(b)(1) provides, in relevant part, that after notice and a hearing, the Court "may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . ." 11 U.S.C. § 707(b)(1). In turn, § 707(b)(3) provides, in pertinent part, that "[i]n considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter . . . , the court shall consider[:] (A) whether the debtor filed the petition in bad faith; or (B) [whether] the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3).

contention, Dini signed and submitted a "declaration" in which he stated under penalty of perjury that "[a]t one point, NTMS's bank account at [the] Bank was overdrawn by $70,000, so [he] borrowed money from Creel to cure the overdrawn account." (*Id.* at Ex. A ¶ 14.)

On October 21, 2014, the Court heard evidence and testimony, primarily from Dini, as to whether the contested debts, including the one owed to Creel, are primarily consumer or non-consumer debts (the "707(b) Hearing").[12]  Thereafter, on January 20, 2015, the Court issued an order in which it concluded that Dini's debts are primarily non-consumer debts (the "707(b) Order"). (Pl.'s Ex. 64.)

Regarding the debt owed to Creel, in particular, the Court found Dini's testimony and other responses inconsistent. (*Id.* at 7.)  After detailing those inconsistencies, the Court found that Dini's testimony that the money he borrowed from Creel was used for business purposes, and his characterization of that debt as non-consumer debt, were sufficiently disputed by the evidence introduced at trial. (*Id.* at 7-9.)  In particular, the Court noted that NTMS's company records did not reflect an overdrawn account and failed to disclose a transfer of $40,000 to cure any alleged overdraft. (*Id.* at 8.)  Accordingly, the Court found that Dini's testimony that $40,000 of the total amount in dispute was used to pay the overdrawn account was unsupported by the evidence at trial. (*Id.*)  Thus, the Court concluded that Dini incurred the Creel debt for primarily personal, family, or household purposes. (*Id.* at 8-9.)  Despite that conclusion, however, the Court found that Sammarco had failed to establish that a majority of Dini's debts could be classified as consumer debts for purposes of § 707(b), and, therefore, Sammarco's motion to dismiss was denied. (*Id.* at 13-14.)

---

[12] Although Bastuga testified briefly at the trial, the majority of the testimony came from Dini.

## Sammarco's Adversary Complaint Against Dini

On November 24, 2013, prior to the filing of his § 707(b) motion to dismiss, Sammarco

filed a two-count adversary complaint against Dini, objecting to his discharge pursuant to §§

727(a)(4) and (a)(7).  (Adv. No. 13-1332, Docket No. 1.)

With the Court's permission, Sammarco subsequently filed three amended complaints.  In

the first, an eight-count complaint filed on June 4, 2014, Sammarco sought a determination that

Dini is not entitled to a discharge under §§ 727(a)(2), (a)(4), and (a)(7).  (Adv. No. 13-1332,

Docket No. 16.)  Subsequently, on September 9, 2014, Sammarco filed a second amended

complaint, this one containing ten counts.  (Adv. No. 13-1332, Docket No. 33.)  In the two new

counts, Sammarco objected to discharge on the grounds that Dini made false statements in

connection with the use of funds borrowed from both the Bank and NTMS.  (*Id.* ¶¶ 101-119.)

On October 7, 2014, Dini filed a motion to dismiss the second amended complaint.  (Adv. No.

13-1332, Docket No. 34.)  According to Dini, dismissal was appropriate because the complaint

was "riddled with conclusory allegations," none of which plausibly suggested that Dini made

either the purported false statements or the alleged transfers with fraudulent intent.  (*Id.* at 3.)  On

June 24, 2015, the Court issued an order, granting Dini's motion in part as to certain counts and

denying the motion in part as to others.  (Adv. No. 13-1332, Docket No. 52.)  The order also

granted in part and denied in part Sammarco's motion for leave to file a third amended

complaint, allowing only six of the counts that Sammarco had proposed.  (*Id.*)

On July 27, 2015, Sammarco filed his third amended complaint (the "Complaint"), the

one at issue in this matter.  (Adv. No. 13-1332, Docket No. 53.)  Although the Complaint

contained nine counts, the parties agreed at trial that only three remain at issue.  (Trial Tr. vol. 3,

12:23-13:7, 41:12-18, 42:2-4, Oct. 3, 2016.)  In Count I, Sammarco alleges that Dini is not

entitled to his discharge under § 727(a)(2) based on his transfers of the Cadillac and Lincoln.  In

Count V, Sammarco objects to Dini's discharge pursuant to § 727(a)(7), arguing that Dini

knowingly made fraudulent statements in NTMS's bankruptcy schedules while his individual

bankruptcy case was pending.  Finally, in Count VII, Sammarco alleges that Dini's discharge

should be denied under § 727(a)(4), because Dini knowingly and with fraudulent intent made

false statements in connection with the debt that he owes to Creel.

     In response to the Complaint, Sammarco filed an answer on August 17, 2015.  (Adv. No.

13-1332, Docket No. 60.)  After multiple continuances and status hearings, the trial was set for

September 13, 2016.  (*See* Adv. No. 13-1332, Docket No. 90.)

     On September 9, 2016, four days before the trial was scheduled to begin, Sammarco filed

a motion to dismiss Dini's bankruptcy case pursuant to § 707(a).  (Bankr. No. 13-25078, Docket

No. 191.)  Relying on the Seventh Circuit case *In re Schwartz*, 799 F.3d 760 (7th Cir. 2015),

Sammarco argued in that motion that Dini's case should be dismissed because both prior to and

after filing his bankruptcy petition, Dini unnecessarily spent money on himself and his family

while refusing to pay creditors like Sammarco.  (*Id.* ¶ 1.)  According to the motion, the *Schwartz*

case "effected a new interpretation of § 707(a) which is directly applicable to Dini's bankruptcy

case." (*Id.*)

     Also just days before the trial, Dini filed two motions in limine, asking the Court to bar

Sammarco from presenting evidence or argument on various issues.  (Adv. No. 13-1332, Docket

Nos. 103 & 104.)  In the first motion, Dini contended that Sammarco's cross-collaterization

argument set forth in Count V was already decided by the Court and, thus, may not be litigated

again under the doctrine of issue preclusion. (Adv. No. 13-1332, Docket No. 103.) In the second motion, Dini argued that Sammarco improperly seeks denial of Dini's discharge based on new claims that do not appear in the Complaint: (1) that Dini and the Bank conspired to put NTMS into bankruptcy in order to "steer" a § 363 sale to the Stalking Horse, and (2) that Dini concealed records from which NTMS's financial condition could be determined, by failing to notify Sammarco of "fraudulent" invoices created at NTMS which masked the poor financial condition of the company.[13] (Adv. No. 13-1332, Docket No. 104.)

Sammarco filed his response to these motions on September 13, 2016, just hours before the trial was to start. (Adv. No. 13-1332, Docket No. 106.) In addition to addressing the substantive arguments in Dini's motions, Sammarco argued that both motions should be denied "outright" for being untimely and prejudicial. (*Id.* at 1.)

Receiving the response only about an hour before the trial was set to begin, the Court declined to consider the motions and, thus, denied them. (Adv. No. 13-1332, Docket Nos. 109 & 110; Trial Tr. vol. 1, 4:8-5:14.) The Court explained, however, that those denials were without prejudice and that Dini could renew the motions–and/or the objections therein–either during the trial or at its conclusion. (Trial Tr. vol. 1, 5:15-21.) Counsel for Dini renewed the objections set forth in the motions repeatedly throughout the course of the trial.

At the conclusion of the two-day evidentiary hearing on September 27, 2016, the Court took the matter under advisement. After a review of all of the relevant pleadings, exhibits, and testimony elicited at trial, the Court is now ready to rule.

---

[13] Sammarco's "fraudulent invoices" argument goes to Count VIII of the Complaint, which the parties agree is no longer at issue.

23

## DISCUSSION

In the three counts that remain at issue in this adversary proceeding, Sammarco argues that Dini should be denied a discharge pursuant to §§ 727(a)(2), (a)(4), and (a)(7). Obtaining a discharge is the primary aim of the "fresh start" that bankruptcy is designed to give debtors. *Gasunas v. Yotis (In re Yotis)*, 548 B.R. 485, 494-95 (Bankr. N.D. Ill. 2016). Accordingly, denial of discharge is a "drastic" remedy reserved for only the truly "pernicious" debtor. *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), *aff'd*, 2003 WL 403138 (N.D. Ill. Feb. 20, 2003). For that reason, the grounds for denial of discharge listed in § 727 are construed strictly against a creditor and liberally in favor of the debtor. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996). A creditor seeking an order denying a debtor a discharge bears the burden of proving each of the elements of the applicable claim by a preponderance of the evidence. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966-67 (7th Cir. 1999); *Muhammad v. Reed (In re Reed)*, 542 B.R. 808, 823 (Bankr. N.D. Ill. 2015).

### A. Section 727(a)(2)(A): Transfer with Intent to Hinder, Delay, or Defraud

In Count I of the Complaint, Sammarco argues that Dini is not entitled to a discharge under § 727(a)(2)(A) based on his trade-ins of the Cadillac and the Lincoln. A debtor's discharge may be denied under § 727(a)(2)(A) when the debtor, "with intent to hinder, delay, or defraud a creditor . . . , has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition[.]" 11 U.S.C. § 727(a)(2)(A). The purpose of the statutory exception is to prevent the discharge of a debtor who tries to avoid paying his creditors by concealing or otherwise disposing of his assets. *Blomberg v. Riley (In re Riley)*, 351 B.R. 662, 670 (Bankr. E.D. Wis. 2006). To prevail under § 727(a)(2),

24

a plaintiff must establish two elements: "an act (i.e., a transfer or a concealment of property) and

an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)." *In re*

*Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002) (internal quotation omitted), *aff'd on other grounds*

*sub nom. Kontrick v. Ryan*, 540 U.S. 443 (2004); *Barber v. Herold (In re Herold)*, Nos. 07-

81575, 07-8139, 2008 WL 4855646, at *3 (Bankr. C.D. Ill. Nov. 10, 2008) (citing *Kontrick*).

The Code defines "transfer," in relevant part, as "each mode, direct or indirect, absolute

or conditional, voluntary or involuntary, of disposing of or parting with . . . property . . . or . . . an

interest in property." 11 U.S.C. § 101(54)(D).  Concealment, for purposes of § 727(a)(2),

consists of "failing or refusing to divulge information to which creditors [are] entitled." *Neary v.*

*Mosher (In re Mosher)*, 417 B.R. 772, 784 (Bankr. N.D. Ill. 2009) (internal quotation omitted).

As for intent, § 727(a)(2) requires proof of actual intent. *Vill. of San Jose v. McWilliams*,

284 F.3d 785, 790 (7th Cir. 2002).  Because a debtor is unlikely to admit his fraudulent intent,

however, a finding of actual intent may be inferred from the surrounding circumstances. *Id.* at

790-91; *In re Snyder*, 152 F.3d 596, 601 (7th Cir. 1998); *In re Krehl*, 86 F.3d 737, 743 (7th Cir.

1996).  Certain factors, or "badges" of fraud, "may warrant the inference." *Cohen v. Olbur (In re*

*Olbur)*, 314 B.R. 732, 744 (Bankr. N.D. Ill. 2004).  These include the debtor's retention of

possession, benefit, or use of the property; the debtor's financial condition; a lack of

consideration for the transfer; a familial or close relationship between the parties; and the

chronology of the events in question. *McWilliams*, 284 F.3d at 791; *Olbur*, 314 B.R. at 744.

Here, Sammarco alleges that Dini "upgraded" two vehicles less than one year prior to the

Petition Date with the intent to hinder or delay Sammarco.  (Am. Pretrial Statement at 2.)

Specifically, Sammarco contends that, "in keeping with his high[-]end lifestyle," Dini traded in

the Cadillac and the Lincoln for "nicer" cars with "complete disregard" for his creditors. (*Id.*; *see also* Compl. ¶¶ 77-84.)

Turning to the elements of § 727(a)(2)(A), the facts sufficiently establish–and Dini does not deny–that there was a transfer of property for purposes of the statutory provision. According to the undisputed evidence, in January 2013, less than a year before the Petition Date, Dini traded in the Cadillac; he used the money he received for the trade-in for the down payment on the Jeep and took a check for the balance. Subsequently, in May 2013, Dini traded in the Lincoln and, thereafter, entered into a three-year lease for the Chrysler. Dini disclosed both trade-ins on his statement of financial affairs. Those trade-ins constitute transfers under § 727(a)(2). *See, e.g.,* *Staniunas v. Delisle (In re Delisle)*, 281 B.R. 457, 464-65 (Bankr. D. Mass. 2002), *aff'd in part,* 2003 WL 26085842 (B.A.P. 1st Cir. June 9, 2003).

The only issue left to decide, then, is whether Dini intended to hinder, delay, or defraud Sammarco by transferring his interests in the vehicles. Sammarco tries to establish Dini's intent in this regard by questioning the timing of the transfers. That is, Sammarco alleges that Dini had the requisite intent for purposes of § 727(a)(2) because he transferred the cars on "the eve of bankruptcy." (*See* Trial Tr. vol. 2, 146:22-147:1; Compl. ¶¶ 80 & 81.) Sammarco also points to Dini's financial condition, arguing that Dini traded in the Cadillac and the Lincoln for newer vehicles, thereby "incurring significant additional debt," at the expense of his creditors. (*See* Compl. ¶¶ 79-84; Am. Pretrial Statement at 2.)

Despite these contentions, the evidence simply does not establish that Dini intended to hinder, delay, or defraud Sammarco by transferring his interests in the vehicles. Instead, Dini credibly testified at trial as to both the reasons that he transferred the cars and the timing of the

26

trade-ins. Specifically, Dini testified that the cars were old and needed to be replaced.
According to Dini, each vehicle had been driven more than 170,000 miles, neither was running
well, and both were in need of repairs. (Trial Tr. vol. 2, 146:18-21, 179:3-6, 180:5-9, 211:22-24,
212:10-13.)

Dini testified that he traded in the Cadillac, the "family" car that had been purchased
primarily for Laura's use, in order to get a more reliable vehicle. (Trial Tr. vol. 2, 144:3-15,
178:21-25, 179:3-17.)   Regarding the timing of the transfer, Dini asserted that he traded in the
car in January 2013 because it still "had some value" at that time. (Trial Tr. vol 2, 179:17-18.)
As a result, he was able to get over $18,000 for the trade-in, some of which he used to defray the
cost of the Jeep.[14]

As for the Lincoln, Dini testified that he was going to start doing business with auto
dealerships and that the fifteen-year-old Lincoln would not convey to prospective clients that he
was running a solid company with which they would want to work. (Trial Tr. vol. 2, 180:3-24.)
Thus, Dini said, he traded in the Lincoln in May 2013 and leased the Chrysler, a vehicle that was
in good working condition and appropriate for attracting new customers.

Dini's testimony in connection with his intent was especially compelling given his
financial situation at the time.  The evidence amply demonstrated that NTMS was in financial
decline, its income dropping and its operating account overdrawn on almost a daily basis.  Faced
with his company's financial deterioration, significant debts of his own, and Sammarco's lawsuit
pending against him in state court, Dini's testimony that he traded in the vehicles with financial

---

[14] Sammarco's counsel failed to elicit testimony from Dini as to what he did with the funds remaining from
the trade-in of the Cadillac.  During closing arguments, Dini's attorney acknowledged that Dini received the balance
of the funds by check and noted, summarily, that he used "some of that money to pay the bills . . . that were coming
due." (Trial Tr. vol. 3, 45:1-8.)

motives in mind is convincing.  True, his subsequent purchase of the Jeep and lease of the

Chrysler caused him to incur additional debt.  He testified, however, that he was able to use

monies from the trade-ins for both the subsequent purchase and lease, that trading in the older

vehicles allowed him to stem repair costs that they were causing him to incur, and that he hoped

to attract new clients for NTMS with the Chrysler.

Other than Dini's testimony, the Court notes that the evidence at trial regarding the

transfers of the vehicles in general, and Dini's intent with respect to those transfers in particular,

was scant and inadequate.  Notwithstanding the paucity of the evidence, however, the Court finds

that Dini's testimony in connection with his intent was credible.  *See Deady v. Hanson (In re*

*Hanson)*, 432 B.R. 758, 776 (Bankr. N.D. Ill. 2010), *aff'd*, 470 B.R. 808 (N.D. Ill. 2012)

(explaining that the Court is in "the best position to assess the credibility of the witnesses and

weigh the evidence"); *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 87 (Bankr. N.D. Ill. 2002)

(noting that "the carriage, behavior, bearing, manner, and appearance of a witness–in short, his

demeanor–is part of the evidence" (internal quotation omitted)).  Based on that testimony,

Sammarco's failure to present evidence to the contrary, and the directive to construe grounds for

denial of discharge strictly against the creditor and liberally in favor of the debtor, the Court finds

that Sammarco has not satisfied his burden of demonstrating intent for purposes of §

727(a)(2)(A).  Accordingly, Dini's discharge will not be denied under that statutory provision.

### B. Section 727(a)(7):  False Oath in Connection with NTMS's Bankruptcy Case

In Count V of the Complaint, Sammarco objects to Dini's discharge pursuant to §

727(a)(7), arguing that Dini knowingly and with fraudulent intent made false statements in

NTMS's bankruptcy schedules.  Under § 727(a)(7), a debtor will be denied a discharge if he "has

28

committed any act specified in paragraph (2), (3), (4), (5), or (6) of th[e] subsection, on or within

one year before the date of the filing of the petition, or during the case, in connection with

another case . . . concerning an insider[.]" 11 U.S.C. § 727(a)(7). With the aim of encouraging

the cooperation of individuals in contemporaneous, related bankruptcy cases, § 727(a)(7) extends

the basis for denial of a discharge to the debtor's wrongdoing in such related cases. *Krehl*, 86

F.3d at 741; *Posnanski v. Kosth (In re Kosth)*, Bankr. No. 09-82212, Adv. No. 09-8131, 2012

WL 863634, at *7 (Bankr. C.D. Ill. Mar. 13, 2012). To prevail under § 727(a)(7), Sammarco

must demonstrate that: (1) the elements of § 727(a)(4), the applicable subsection here, are

satisfied;[15] (2) the acts at issue took place during the current case or within one year before the

filing of the petition; and (3) those acts occurred in connection with the bankruptcy case of an

insider. *See Kosth*, 2012 WL 863634, at *7.

The Code defines the term "insider," in relevant part, as a "corporation of which the

debtor is a director, officer, or person in control" if the debtor is an individual and as an "officer

of the debtor" if the debtor is a corporation. 11 U.S.C. § 101(31)(A)(iv) & (B)(ii). Here, the

parties do not dispute that Dini was the president of NTMS. Thus, he and NTMS were "insiders"

of one another for purposes of § 727(a)(7).

Sammarco alleges that Dini made false statements in NTMS's bankruptcy schedules

regarding the amount of debt that the company owed to the Bank while his individual bankruptcy

case was pending. Specifically, Sammarco argues that Dini did not disclose in NTMS's

schedules that the company was liable for the obligations of Dini, Laura, and the Dini Trust by

---

[15] Section 727(a)(4) is discussed *infra* in connection with the debt that Dini incurred by borrowing money from Creel.

virtue of the loan instruments executed in connection with the Dini and NTMS Loans and the

first modification agreement.  According to Sammarco, Dini knowingly failed to make the

required disclosures with the intent to deceive in order to protect Laura and the Dini Trust from

liability.

Throughout the trial, counsel for Dini objected to Sammarco's attorney putting on

evidence with respect to the cross-collateralization allegations in Count V, as well as allegations

that Dini and the Bank conspired to put NTMS into bankruptcy in order to steer a 363 sale to the

Stalking Horse.  According to Dini, the cross-collateralization argument was already addressed

and decided by the Court in connection with the 363 sale and, therefore, may not be litigated

again under the doctrine of issue preclusion.  The Court allowed Sammarco's counsel to present

evidence with respect to the allegations in Count V, as well as those related to Sammarco's

conspiracy theory, but noted that Dini's objection would be taken under advisement.  (*See* Trial

Tr. vol. 1, 43:12-45:4.)

After a review of the facts and applicable case law, the Court now finds that both the

cross-collateralization and conspiracy issues were previously decided and that, thus, those issues

may not be litigated again under the doctrine of issue preclusion.[16]  Issue preclusion (also known

as collateral estoppel) prevents a party from relitigating an issue that it already litigated and lost.

*Jensen v. Foley*, 295 F.3d 745, 748 (7th Cir. 2002).  Under the doctrine, a party is precluded from

relitigating an issue if all of the following elements are met:  (1) the issue sought to be precluded

is the same as the one involved in a prior action; (2) the issue was actually litigated; (3)

---

[16] Although Dini contends that evidence supporting Sammarco's conspiracy argument should not be
admitted because conspiracy is a new claim that does not appear in the Complaint, the Court finds that the doctrine
of issue preclusion equally applies to that evidence.

determination of the issue was essential to the final judgment; and (4) the party against whom

preclusion is invoked was represented by counsel in the prior action. *Dexia Crédit Local v.*

*Rogan*, 629 F.3d 612, 628 (7th Cir. 2010); *Crane v. McGuire (In re McGuire)*, 459 B.R. 348, 350

(Bankr. N.D. Ill. 2011).

All of the elements have been satisfied in this matter. First, the issues sought to be

precluded are the same ones that were involved in connection with the Sale Hearing held by the

Court on December 4, 2013. The Court's oral ruling, read into the record at the hearing

approving the sale on December 10, 2013 (the "Ruling"), expressly addressed the failure of both

Dini and the Bank executives to initially disclose the cross-collateralization of the NTMS and

Dini Loans, the same issue sought to be precluded here. Similarly, the Ruling explicitly

discussed the bidding and sale processes, focusing on the parties' conduct in proposing the

Stalking-Horse offer, the Bank's terms which put the Stalking Horse in a favorable position for

purposes of the sale, and the importance of the Bank's consent to the terms of the sale.

Second, the issues were actually litigated. An issue is "actually litigated" when it "is

properly raised, by the pleadings or otherwise, . . . is submitted for determination, and is

determined." *Restatement (Second) of Judgments* § 27 cmt. d (Am. Law Inst. 1982). In contrast,

an issue is not "actually litigated" when judgment is entered "by confession, consent, or default"

because a party "choose[s] not to raise [i]t." *Id.* cmt. e; *see also Chi. Reg'l Council of*

*Carpenters v. Prate Installations, Inc.*, No. 10 C 5431, 2011 WL 336248, at *5 (N.D. Ill. Jan. 31,

2011). Here, the Court's Ruling which ultimately resolved the Sale Procedures Motion and

Sammarco's Motion to Amend the Sale Procedures Order satisfy the "actually litigated"

requirement. Those matters were briefed, the Court conducted multiple hearings on them, and

31

the Ruling read into the record at the Sale Approval Hearing on December 10, 2013 resolved
them.

Third, the determination of the issues was essential to the final judgment. In reaching that
final judgment–the approval of the 363 sale–the Court was compelled to consider the propriety of
the parties' failure to disclose the cross-collateralization of the loans and the transparency of the
bidding and sale processes. In doing so, the Court found that the "initial failure of the parties to
disclose the cross-collateralization . . . was not the result of a purposeful misrepresentation or
withholding." (Sale Approval Trial Tr., 10:1-4). The Court further found that NTMS's conduct
in proposing the Stalking-Horse offer "did not involve any wrongdoing" and that "the process did
not take advantage of other bidders." (Sale Approval Trial Tr., 10:10-13). Although the Bank's
terms put the Stalking Horse in a favorable position for purposes of the 363 sale, the Court said,
"that favorable position did not result [from] any bad faith, collusion or fraud. It was . . . simply
the reality of the financial position of the parties." (Sale Approval Trial Tr., 10:19-24). Those
determinations were essential to the Court's ultimate conclusions that the Stalking Horse was a
good-faith purchaser under § 363 and that the sale was in the best interest of the NTMS
bankruptcy estate.

Finally, Sammarco, the party against whom preclusion is invoked, was represented by
counsel both during the Sale Hearing and in all related hearings prior to and leading up to that
Hearing. Sammarco's counsel at the Sale Hearing also represents him in the adversary
proceeding at bar.

Notwithstanding the discussion above, Sammarco argues that issue preclusion does not
apply here. According to Sammarco, the Sale Hearing concerned whether the Stalking Horse

was a good-faith purchaser and whether a sale to the Stalking Horse was in the best interest of

the estate, not whether Dini's conduct justifies a denial of discharge.  Contrary to Sammarco's

argument, the Seventh Circuit has explained that issue preclusion "bars successive litigation of

an issue of fact or law actually litigated and resolved in a valid court determination essential to

the prior judgment, *even if the issue recurs in the context of a different claim*." *Rogan*, 629 F.3d

at 628 (emphasis added).

Accordingly, the Court finds that pursuant to the doctrine of issue preclusion, Sammarco

is bound by the Ruling resolving the issues in the motions that he previously litigated before this

Court, and he is precluded from litigating those issues again.  Dini's objection to the presentation

of evidence is therefore sustained, and the evidence put on by Sammarco's attorney in connection

with the cross-collateralization allegations in Count V, as well as allegations that Dini and the

Bank conspired to put NTMS into bankruptcy to steer a 363 sale to the Stalking Horse, will not

be admitted.  As a result, Dini's discharge will not be denied under § 727(a)(7).

### C.  Section 727(a)(4)(A):  False Oath in Connection with Dini's Bankruptcy Case

Finally, in Count VII of the Complaint, Sammarco argues that Dini's discharge should be

denied under § 727(a)(4)(A), because Dini knowingly and with fraudulent intent made false

statements with respect to the debt that he owes to Creel (the "Creel debt").  Section 727(a)(4)(A)

enforces the debtor's obligation to provide full and accurate information about himself and his

affairs by denying a discharge to a debtor who has "knowingly and fraudulently, in or in

connection with the case[,] . . . made a false oath or account[.]"  11 U.S.C. § 727(a)(4)(A);

*Bostrom*, 286 B.R. at 359.  To prevail under § 727(a)(4)(A), Sammarco must demonstrate that:

(1) Dini made a statement under oath; (2) the statement was material to the bankruptcy case; (3)

the statement was false; (4) Dini knew that the statement was false; and (5) the statement was made with an intent to deceive. *See Schechter v. Hansen (In re Hansen)*, 325 B.R. 746, 758 (Bankr. N.D. Ill. 2005).

Sammarco alleges that Dini made multiple false oaths in connection with the Creel debt that Dini knew were false and which he made with fraudulent intent. Specifically, Sammarco contends that Dini made inconsistent, conflicting statements under oath with respect to the amount of the Creel debt at the 707(b) Hearing in order to classify it as business debt. Those statements appeared in Dini's answers to Sammarco's interrogatories and requests for admission, as well as in his stipulations in connection with the 707(b) Hearing. (*See* Pl.'s Ex. 64 at 7.) Sammarco also alleges that Dini falsely represented in his testimony, as well as in a declaration supporting his objection to the 707(b) motion to dismiss (the "Declaration"), that the Creel debt was used to pay an NTMS overdraft of $70,000. According to Sammarco, Dini's statements were false and made only for "litigation advantage." (Compl. ¶ 119.)

Applying the facts to the elements of § 727(a)(4)(A), the Court finds that Sammarco is able to satisfy only two. First, Dini made statements under oath, because trial testimony, declarations made under penalty of perjury, and answers to interrogatories and other discovery all constitute statements under oath for purposes of § 727(a)(4)(A). *See Hunt v. O'Neal (In re O'Neal)*, 436 B.R. 545, 561 (Bankr. N.D. Ill. 2010); *Buckeye Ret. Props. of Ind., LLC v. Tauber (In re Tauber)*, 349 B.R. 540, 560-61 (Bankr. N.D. Ind. 2006); *Structured Asset Servs., L.L.C. v. Self (In re Self)*, 325 B.R. 224, 245 (Bankr. N.D. Ill. 2005). Second, all of the statements made by Dini concerned his financial affairs and are thus material to the bankruptcy case. *See Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 574 (Bankr. N.D. Ill. 2000).

34

As to the third element, Sammarco stumbles. He seems to suggest that Dini's statements were false based solely on the conclusions reached by the Court in the 707(b) Order. In that order, the Court found, *inter alia*, that Dini's testimony that the Creel debt was used for business purposes was sufficiently disputed by the evidence introduced at trial. The Court also found that Dini's testimony regarding the amount of the Creel debt was inconsistent, and that, contrary to the figures to which Dini testified, the entire $290,000 loan from Creel was incurred primarily for personal, family, or household purposes. As to the overdraft that Dini claimed was cured by the money advanced by Creel, the Court found that NTMS's records did not reflect an overdrawn account and that, thus, Dini's testimony in that regard was unsupported by the evidence at trial. The Court reached these conclusions in deciding whether Dini's debts were primarily consumer debts in the context of § 707(b), and those conclusions were, necessarily, based on the evidence presented at the 707(b) Hearing.

At the hearing on Sammarco's objection to Dini's discharge (the "727(a) Hearing"), however, additional evidence in connection with the Creel debt was introduced. Specifically, NTMS's former controller Elizabeth McDonough credibly testified that some of the money from Creel was used to cure NTMS's overdrawn account at the Bank and to pay both personal and business expenses. Significantly, this testimony corroborated Dini's. As for the NTMS overdraft, Dini testified that NTMS's account was overdrawn by as much as $70,000 in the spring of 2012 and that he borrowed money from Creel to address that overdraft. That testimony also corresponded to Dini's statement in the Declaration in which he said that "[a]t one point, NTMS's bank account . . . was overdrawn by $70,000, so [he] borrowed money from Creel to cure the overdrawn account." (Pl.'s Ex. 59 ¶ 14.) Despite the fact that Dini was not able to

35

produce any written documentation supporting the amount of the overdraft at issue, he credibly

testified at the 727(a) Hearing that he remembered seeing a large deficit, of "sixty or seventy

grand," either on a computer screen or in a document. McDonough corroborated Dini's

testimony in that regard and pointed to overdrafts in the documents presented as evidence, stating

that the company account was frequently overdrawn and that she recalled seeing an overdraft of

$60,000 at some point in 2012. McDonough also explained that overdrafts were not necessarily

reflected in NTMS's general ledger unless the Bank charged an overdraft fee.

Without the benefit of McDonough's testimony at the 707(b) Hearing, the Court had to

rely exclusively on Dini's uncorroborated testimony and the "company records" which did "not

reflect an overdrawn account." (Pl.'s Ex. 64.) Thus, the Court's finding–that Dini's testimony

about the Creel debt was unsupported and disputed by the evidence at trial–was based on only

that evidence, as the Court repeatedly noted in the 707(b) Order.

Sammarco's argument that Dini made false statements to gain litigation advantage in

connection with the 707(b) motion to dismiss also fails. Statements made in an effort to prevail

in litigation are not necessarily false, and the evidence at the 727(a) Hearing showed that the ones

that Dini made regarding the Creel debt were accurate to the best of his knowledge at the time

they were made. In that regard, Dini testified that his focus at NTMS was on sales and that he

had no practical experience in accounting, bookkeeping, or finance. Accordingly, he relied on

others–the NTMS controller, his attorneys, and the Bank employees with whom he did

business–when he needed financial information, including the figures alleged to be business debt

in connection with the 707(b) motion to dismiss. (Trial Tr. vol. 1, 109:25-110:21; Trial Tr. vol.

2, 152:16-156:20). The record does not support a finding that Dini knowingly made false

statements in order to gain some advantage with respect to that motion, and, in any event, his statements had no impact on the ultimate outcome of the matter.

For the reasons discussed above, the Court simply cannot find that Dini's statements regarding the Creel debt were false for purposes of § 727(a)(4)(A). As such, the remaining elements under that statutory provision need not be addressed. The Court finds that Sammarco has not satisfied his burden under § 727(a)(4)(A), and, thus, Dini's discharge will not be denied thereunder.

All that remains now is Sammarco's § 707(a) motion to dismiss Dini's bankruptcy case and bar him from re-filing for three years. (Bankr. No. 13-25078, Docket No. 191.) Dini has already filed a "preliminary response" in which he argues that the motion should be denied under the equitable doctrine of laches. (*See* Bankr. No. 13-25078, Docket No. 192.) Dini is directed to file a "final" response by January 6, 2017. Sammarco is directed to file a reply by February 3, 2017. A status hearing on the motion is set for February 9, 2017 at 10:00 a.m. before the undersigned in Courtroom 615. Because a discharge cannot be entered while a motion to dismiss under § 707 is pending, Fed. R. Bankr. P. 4004(c)(1)(D), the Clerk is directed to delay the entry of discharge in Dini's bankruptcy case until further notice.

## CONCLUSION

For the foregoing reasons, the Court finds that Sammarco has failed to meet his burden to establish the elements required under §§ 727(a)(2), (a)(4), and (a)(7). As such, Dini's discharge will not be denied. A separate order will be entered consistent with this Memorandum Opinion.

Dated:  **December 15, 2016**                    ENTERED:

                                                                    Janet S. Baer
                                                                    United States Bankruptcy Judge